J-S21002-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: C.G.V., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.V., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 316 MDA 2026 |

Appeal from the Decree Entered January 20, 2026
In the Court of Common Pleas of Huntingdon County
Orphans' Court at No(s): 2025-00015

| | | |
|---|---|---|
| IN RE: E.A.V., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.V., MOTHER | : | |
| | : | |
| | : | |
| | : | No. 401 MDA 2026 |

Appeal from the Decree Entered January 20, 2026
In the Court of Common Pleas of Huntingdon County
Orphans' Court at No(s): 2025-00014

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:           **FILED: JULY 9, 2026**

J.V. ("Mother") appeals from the January 20, 2026 decrees that terminated her parental rights to her daughters C.G.V. (born in February 2015) and E.A.V. (born in October 2019) (collectively "the Children").[1]  We affirm.

---

[1] Neither child's birth certificate lists a father.  The man Mother subsequently identified as C.G.V.'s father died in 2018.  E.A.V.'s purported father, for whom Mother provided only a first name, did not come forward to contest termination of his rights despite notice of these proceedings through publication, and has not filed an appeal.

We glean the following background summary from the opinion of the orphans' court, which is supported by the certified record. In December 2022, the Huntingdon County Children's Services Agency ("the Agency") received reports of C.G.V.'s truancy from school. When the unexcused absences continued despite the support services offered by the Youth Advocate Programs organization ("YAP"), C.G.V. was declared dependent on May 30, 2023, but remained in Mother's care. Since truancy was the primary concern and E.A.V. was not yet of school age, no action was taken as to her.

Approximately five months later, a raid targeted at another individual residing in Mother's home resulted in the discovery of "drug paraphernalia, weapons, and generally 'unsanitary' conditions in Mother's home that raised concerns regarding the Children's welfare, which were reported to the Agency." Orphans' Court Opinion, 3/20/26, at 3. "The Agency investigated and found, among other things, that syringes used by Mother to inject methadone were stored in the bedroom where she slept with the Children[,] . . . highly accessible and intermixed with the Children's belongings." *Id*. The Agency filed for emergency protective custody, which the court granted. As a result, both Children were removed from Mother's home and placed in foster care on September 27, 2023.

For a time, Mother made progress toward reunification, consistently attending supervised visits, complying with treatment for drug addiction, and testing positive in drug screens only for proscribed medication. Therefore, in

March 2024, Mother's time with the Children increased to include both weekly supervised visits and unsupervised overnight visits on weekends. However, "[e]ven with Mother's progress during this time, cracks were beginning to show." *Id*. at 4. Specifically, "[a]lthough the original primary concern was Mother's drug use and the manner in which she stored her syringes, concerns also became evident regarding Mother's ability to maintain steady employment, stable housing, and provide proper supervision for the Children." *Id*. at 4-5. Nonetheless, Mother did well enough to convince the Agency and the court that she was able to resume caring for C.G.V. and E.A.V., which was ordered in July 2024.

The orphans' court explained:

The Children were in Mother's home for just shy of two months. During that time Mother's compliance became "minimal" and more issues arose regarding her ability to appropriately supervise the Children. Specifically, while Mother remained cooperative with the Agency caseworker ([Stephen] Strauss), her cooperation with the YAP caseworker declined. She would speak with the YAP caseworker on the phone, and allow the YAP caseworker into the home for unannounced visits, but cancelled or claimed to be unavailable for every scheduled visit that the YAP caseworker had attempted since July 30th. More significant was that on September 5, 2024, two YAP caseworkers went to Mother's home at 8:00 am for a scheduled visit, observed the Children's school buses come and leave, and did not see the Children get on them. When they contacted Mother to find out what had happened, Mother claimed that she had gone to an appointment and taken the Children with her. The caseworkers remained outside Mother's home to continue observing it, and at 9:20 [a.m.] they saw Mother at a location "up the street" from the home without the Children. The caseworkers then found Mother hiding from them behind the home. When asked, Mother admitted to the caseworkers that the Children were in the home alone. As a result of these issues, the Agency again requested that the Children be

- 3 -

removed from Mother's home at the September 24, 2024, permanency review hearing, and the court agreed. The Children were removed from Mother's home and placed in foster care with their current foster parents [("Foster Parents")].

*Id*. at 6 (cleaned up).

Furthermore, Mother had "renewed involvement with the criminal justice system, which resulted in two convictions over the course of 2024 and 2025." *Id*. She pled *nolo contendere* to a count of passing bad checks, for which she received a sentence of probation, and then to theft by unlawful taking, which involved her stealing an air fryer from the Agency's offices. For the latter offense, Mother failed to appear for sentencing, was arrested on a bench warrant, was sentenced to five to twenty-three months of incarceration, and was paroled in mid-November 2025. *Id*. at 6-8.

During the Children's second placement, Mother's cooperation with Agency caseworkers and court orders declined, and her addiction recovery progress was "erased." *Id* at 8. Mother failed to appear consistently for scheduled drug testing, found means to avoid unannounced tests, only sporadically shared results of tests from her suboxone treatment provider, declined to establish that she retained housing and utilities, and, while she did visit C.G.V. and E.A.V., rarely arrived to scheduled appointments on time and did miss multiple visits only in part due to her incarceration. *Id*. at 8-12. As summarized by the orphans' court, the Agency caseworker, Mr. Strauss, recounted an example of Mother's lack of cooperation with unannounced testing attempted in August 2025:

- 4 -

As he approached Mother's home late in the day he saw a woman he believed to be Mother outside, riding a bicycle. The woman did not stop or acknowledge Mr. Strauss. He tried calling and texting Mother, and Mother replied with a text confirming that it was in fact her he had seen on the bike and telling him that she had not stopped because she was going to the emergency room at the local hospital. When Mr. Strauss responded by pointing out that she was heading away from the hospital when he had seen her, Mother claimed that she thought she had forgotten something at home, but then realized she had not, which was why she did not stop. Mr. Strauss returned to the office, clocked out, and began heading home. He stopped at a convenience store on the way home and ran into Mother there. About fifteen minutes had elapsed from when he last communicated with her. When he asked her why she was not at the hospital, she made an excuse about having to make a stop at the store. He asked her to provide written confirmation of having been to the hospital that day, both at that time and again later, so he could obtain confirmation for why he had not been able to drug test her. No confirmation was ever provided.

*Id*. at 12 (citing N.T. Termination Hearing, 12/1/25, at 18-19).

On October 9, 2025, the Agency filed petitions to terminate Mother's parental rights as to C.G.V. and E.A.V., invoking the grounds provided in 23 Pa.C.S. § 2511(a)(5), (a)(8), and (b). The orphans' court held a hearing on the petitions on December 1, 2025, at which Mr. Strauss and Mother testified.[2]

Mr. Strauss detailed Mother's regression, rather than progression, during the Children's second placement. *See* N.T. Termination Hearing, 12/1/25, at 26. Along with her failure to comply with drug screening, and her persistent denial that she was using drugs again "despite it being very obvious

---

[2] The Children were represented at the hearing by a guardian *ad litem* ("GAL") and separate legal counsel. However, both attorneys advocated in favor of termination.

that there was concerns," Mr. Strauss spoke of Mother's missed, and sometimes inappropriate, interactions with the Children. *Id*. at 22. For example, when Mother appeared late for her October 25, 2025 visit, she "caused a lot of confusion with the [C]hildren" by telling them "that they were going to be going to live with somebody else[.]" *Id*. at 16. This prompted Foster Parents to call and ask "what was going on and why were they so upset; where are they going. So [he] had to calm the [C]hildren and [F]oster [P]arents in regards to what was currently happening." *Id*. at 17. Mother's telephone calls to Children were terminated for similar reasons:

> The [C]hildren had negative behaviors on the backside of phone calls. After phone calls would occur, [they] would be acting out in the foster home, including becoming physical with one another and being verbally--yelling and being upset in the foster home when it was uncharacteristic for their personality the rest of the time.

*Id*. at 37-37.

While Mother's relationship with the Children had recently led to these negative results, Mr. Strauss attested to how "phenomenally well" the Children were doing overall with Foster Parents, who wished to adopt them. *Id*. at 25. Contrary to when they resided with Mother, the Children's educational and medical needs were being met in Foster Parents' home. In the thirteen months of placement with Foster Parents, the Children developed a "strong bond" with them, referring to them as mom and dad. *Id*. While C.G.V., who was nearly eleven years old at the time of the termination hearing, indicated

that she wanted to continue to see Mother, she also stated that she wanted to be adopted by Foster Parents. *Id*. at 39.

For her part, Mother testified that the second removal of the Children from her home caused "a bad depression" which, in turn, triggered her drug relapse. *Id*. at 45. Mother acknowledged on the record that she had made mistakes, yet she expressed the belief that "[t]he one thing [she] never messed up was being a mom." *Id*. at 52. Mother offered substantial testimony about her emotional bond with the Children, and the detrimental impact being away from them has caused her. *Id*. at 50-54. However, she did not volunteer any evidence concerning the Children's reciprocation of those feelings.

The orphans' court also heard from the Children's GAL, who indicated that she met with the Children several times in the home of Foster Parents. She confirmed that C.G.V. and E.A.V. refer to Foster Parents as mother and father, and that C.G.V. said she wanted to remain with them. *Id*. at 61. The GAL explained to C.G.V. that meant she would no longer see Mother. *Id*. C.G.V. "understood that, and she was okay with that." *Id*. The Children's legal counsel "echo[ed] the observations of" the GAL. *Id*. at 62. He represented that he spoke to both Children, but C.G.V. "was much more expressive because she is older." *Id*. Her legal position was that she wished to be adopted by Foster Parents, "but she also desire[d] to still have contact

with her mother" if there was "a way for that to happen."[3] *Id*. As such, both legal counsel and the GAL advocated that it served Children's needs and welfare to grant the Agency's petition.

As the hearing approached its conclusion, Mother conceded that the conditions that led to Children's placement persisted. *Id*. at 62 ("I'm not disputing the children are dependent."). However, she urged the court to defer rendering a decision out of concern about the impact termination could have on C.G.V. and E.A.V. She acknowledged the testimony establishing the Children's bond with Foster Parents, but suggested that the state of the record was such that "we don't know if there is a bond between the [C]hildren and [Mother]. Furthermore, we don't know what impact terminating the parent/ child relationship would have on the [C]hildren." *Id*. at 63.

The orphans' court took the matters under advisement. After receiving the hearing transcripts and reviewing the evidence, the court entered the appealed-from decrees terminating Mother's rights to both Children. These timely appeals followed, accompanied by Pa.R.A.P. 1925(a)(2)(i) concise statements of errors complained of on appeal. The orphans' court authored one Rule 1925(a) opinion addressing both appeals, and this Court consolidated them *sua sponte*.

_____

[3] There is no indication in the certified record that E.A.V., who turned six shortly before the termination hearing, explicitly stated a preference. However, we infer from her counsel's advocacy that, to the extent that she articulated a preference, she favored termination.

Mother presents the following question for our determination:

Whether the [orphans' c]ourt erred in terminating [Mother]'s parental rights to the subject [C]hildren, because the Agency failed to meet its burden by clear and convincing evidence (as well and more particular, the Agency failed to present any evidence on the bond between [Mother] and the subject [C]hildren, and the impact termination of the [Mother]'s parental rights would have on the [C]hildren).

Mother's brief at 3.

The following governs our consideration of Mother's issue:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re Adoption of B.G.S.*, 240 A.3d 658, 662 (Pa.Super. 2020) (cleaned up).

Involuntary termination of parental rights is governed by 23 Pa.C.S. § 2511, which sets forth the requisite two-part analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

- 9 -

parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id*. at 663 (cleaned up).

The court terminated Mother's parental rights pursuant to § 2511(a)(8) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, [twelve] months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

Here, Mother does not challenge the court's findings as to § 2511(a)(8). As noted, she conceded that the Children remained dependent at the time of the hearing, which occurred well beyond twelve months after they were removed from her care and placed with Foster Parents. Therefore, we proceed

- 10 -

directly to § 2511(b). *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa.Super. 2017) (explaining that we will not address specific subsections of § 2511 for which there are no developed challenges in the appellant's brief).

We review the court's conclusions as to subsection § 2511(b) mindful of the following. "When considering whether termination of parental rights serves a child's needs and welfare, courts must consider the matter from each child's perspective, placing the child's developmental, physical, and emotional needs and welfare above concerns for the parent." *In re Adoption of G.W.*, 342 A.3d 68, 90 (Pa.Super. 2025) (cleaned up). Factors pertinent to the best-interests assessment include the existence of a necessary and beneficial bond with the parent and the effect severing it would have on the child, as well as other intangibles such as love, comfort, security, stability, and the child's need for permanency. *See Interest of K.T.*, 296 A.3d 1085, 1106 (Pa. 2023).

As the orphans' court aptly noted, for a time, decisional law in this area tended to focus heavily on the parent-child bond, with formal bonding assessments conducted and terminations denied solely upon the basis that severing the bond with the parent would adversely affect the child. *See* Orphans' Court Opinion, 3/20/26, at 23. However, with *Interest of K.T.*, our High Court made it plain that "the scope of the § 2511(b) analysis is much broader than bond alone, and that no one factor under § 2511(b) controls above all others." *Id*. The inquiry must also include consideration of "the child's need for permanency and length of time in foster care . . . ; whether

- 11 -

the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Interest of K.T.*, 296 A.3d at 1113.

The court's analysis of the bond between a parent and a child neither requires expert testimony nor a "formal bonding evaluation[,]" but rather permits "[s]ocial workers and caseworkers [to] offer evaluations as well." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (cleaned up). To the extent that a parent-child bond does exist, the court must "assess whether the bond is necessary and beneficial to the child, such that maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Adoption of G.W.*, 342 A.3d at 90 (cleaned up). The court must also contemplate "the effect upon the child of severing the bond." *Id*. We have long recognized that "the severing of any parent-child bond may be emotionally painful for a child[.]" *Id*. *See also Interest of K.T.*, 296 A.3d at 1111 (noting that "even badly abused and neglected children" retain affection and positive feelings for their parents).

Thus, a finding that severing the parental bond will be emotionally painful for the child in question does not *per se* resolve the § 2511(b) inquiry. Rather, "focusing upon the child's development, and mental and emotional health, the orphans' court should assess whether severing the bond is the kind of loss that would predictably cause extreme emotional consequences or

significant, irreparable harm to the child." ***Adoption of G.W.***, 342 A.3d at 90 (cleaned up).

Overall, orphans' "courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." ***Interest of K.T.***, 296 A.3d at 1113 (footnote omitted). "However, when weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly." ***Adoption of G.W.***, 342 A.3d at 91 (cleaned up).

Turning to the case *sub judice*, Mother argues that the orphans' court should not have granted the Agency's petitions because it "did not meet its burden of clear and convincing evidence to terminate her parental rights to the subject children, especially when it comes to the significance of the parental bond between Appellant and the [C]hildren." Mother's brief at 17. She highlights that there was no bonding assessment performed and that the court erred in relying on Mr. Strauss's testimony in this regard. Mother maintains that, given the stated wish to maintain contact with her, "[i]t is readily apparent that some type of relationship or bond exists between the [C]hildren and [Mother], and said relationship or bond, must be examined by the [orphans' c]ourt, which did not occur in this case, based on what was presented by the Agency." ***Id***. at 18.

The orphans' court addressed Mother's claim as follows:

Mother faults the Agency and the court for failing to adequately consider the bonds that exist between her and the Children. Her contention is not only baseless, but rooted in caselaw that overemphasized consideration of the parent-child bond and has been overruled or abrogated by [**Interest of K.T.**] No one involved in the instant matters denies that bonds exist between the Children and Mother. This is clearly so for [C.G.V.], who has expressed a desire to maintain a degree of contact with Mother after termination and adoption, if possible. But the mere existence of a parent-child bond, or the absence of a detailed evaluation of its strength by a licensed professional, is far from sufficient to overcome a mountain of evidence that termination is in the best interests of a child.

Here, the evidence that the bonds between the Children and their foster parents are necessary and beneficial is irrefutable. The Children are doing very well in their foster parents' care. They are having their educational, emotional, and medical needs met, and are showing the kind progress and development expected when children are being raised in a stable and emotionally secure home environment. In contrast, the risks present when children lack such a home environment are well-known, and the detrimental effects of Mother's inability to provide such an environment are illustrated by evidence such as the stress and atypical behavior shown by the Children after phone calls and visits with them. Further, while children are not always able to articulate their own needs directly, they are often able to recognize and communicate them if one listens carefully. The fact that the Children want to remain in their foster parents' home, and that [C.G.V.] in particular has expressed a desire to be adopted by them, shows the strength of the bonds between the Children and [Foster Parents]. Termination of Mother's parental rights will certainly have a detrimental effect on both Children, but the significance of that effect pales in comparison to the magnitude of the effect that severing the Children's bond with their foster parents and returning them to Mother's care would have.

The court feels compelled to note here that it does not doubt the sincerity of the love that Mother has expressed for the Children, nor the sincerity of her expressed belief that she has faced an uphill battle in her attempts to obtain their return. But, as has so many times been expressed by the courts of this Commonwealth,

- 14 -

a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting. The Children have spent the majority of the past two and a half years in placement, waiting for Mother to engage in a meaningful fashion with this court, the Agency, and various service providers. She has not done so, and it does not appear that she is willing to change her mind about doing so any time soon.

. . . The termination of Mother's parental rights is in the best interests of the Children. That finding is based not only on evaluation of the bonds present between the Children and Mother vis-a-vis the bonds present between the Children and their foster parents, but the totality of the Children's developmental, physical, and emotional needs in light of the evidence of record.

Orphans' Court Opinion, 3/20/26, at 24-26 (cleaned up, extra paragraph break inserted).

Our review of the certified record shows that the court's decision is supported by the evidence and constitutes no abuse of discretion. First, the orphans' court correctly applied the law by examining the array of factors identified by our Supreme Court as pertinent to the § 2511(b) best interest analysis. That included the Children's need for permanency after being in foster care for most of the prior thirty months, as well as the facts that the Children are thriving in the preadoptive home provided by Foster Parents, who have been meeting their developmental, physical, and emotional needs, and that they are strongly bonded with Foster Parents, whom they call mother and father.

The court was well within its rights to conclude that this was a necessary and beneficial bond, unlike their bond with Mother, who, after years of causing

- 15 -

the Children to be dependent through her inability to care for them, still believed that she "never messed up . . . being a mom." N.T. Termination Hearing, 12/1/25, at 52. That both the Children wanted to remain with Foster Parents, and that C.G.V. "was okay with that" meaning she would no longer be able to see Mother, *id*. at 61, reveals that the bond with Mother was neither necessary and beneficial nor one that would cause "extreme emotional consequences or significant, irreparable harm" to the Children if it was severed. ***See Adoption of G.W.***, 342 A.3d at 90 (cleaned up). No formal bonding assessment was required, and the court's reliance upon Mr. Strauss's testimony was not misplaced. ***See In re Z.P.***, 994 A.2d at 1121.

Thus, while the orphans' court concluded that the Children predictably will suffer some emotional pain from the severance of their ties with Mother, it permissibly weighed that against the overwhelming benefits to their healthy development engendered by freeing them to be adopted by Foster Parents. As the Agency succinctly summarized:

> Termination of Mother's parental rights would . . . not destroy a necessary and beneficial parental relationship. Rather, it would allow the Children to achieve the permanency, safety, and stability they deserve through adoption by caregivers with whom they are strongly bonded and thriving. As the Superior Court has recognized, children are entitled to permanence and should not be forced to indefinitely wait for a parent to remedy longstanding incapacity and instability.

Agency's brief at 18. ***See also*** GAL's brief at 30 (same); Legal Counsel's brief at 23-25 (same).

Accordingly, we affirm the decrees terminating Mother's parental rights to C.G.V. and E.A.V.

Decrees affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 07/09/2026